IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FORSYTHE GLOBAL, LLC,              )
                                   )
      Plaintiff,                   )
                                   )
          v.                       )     1:16cv98(JCC/IDD)
                                   )
QSTRIDE, INC.,                     )
                                   )
      Defendant.                   )

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Plaintiff Forsythe Global, LLC's ("Plaintiff" or "Forsythe") Motion to Dismiss Defendant QStride, Inc.'s ("Defendant" or "QStride") Counterclaims. For the following reasons, the Court grants Plaintiff's motion to dismiss and will dismiss Counts II and III of Defendant's Counterclaims without prejudice.

### I. Background

At the motion to dismiss stage, the Court must read the complaint as a whole, construe the complaint in a light most favorable to the non-movant, and accept the facts alleged in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The following facts are taken from Defendant's Answer and Counterclaims [Dkt. 7] and incorporate, where noted, facts from Plaintiff's Complaint [Dkt. 1]. They are accepted as true only for purposes of this motion.

1

Forsythe is a limited liability company organized under the laws of Virginia with its principal place of business in McLean, Virginia. (Compl., ¶ 4.) Forsythe provides a range of corporate consulting services. (*Id.*) QStride is a Michigan corporation with its principal place of business in Detroit, Michigan. (*Id.*) QStride also provides a range of corporate and IT consulting services. (*Id.*) On December 20, 2013, QStride and Forsythe entered into a Professional Services Agreement ("PSA") under which Forsythe agreed to provide future consulting services to QStride and several of QStride's "end customers" pursuant to subsequent individualized Statements of Work ("SOWs"). (*Id.* at ¶¶ 11-12.) The 2013 PSA also provides that in exchange for ancillary services, QStride was to pay twenty-five percent (25%) of either some, or all software license revenue generated by QStride. (*Id.* at ¶ 13; Answer, ¶ 13.) The PSA includes billing provisions which provide that QStride "shall pay the applicable amount of [Forsythe's monthly services invoice] within thirty (30) days after receipt, unless otherwise specified in the SOW." (Compl., ¶ 14.) The PSA contains detailed language regarding how QStride should dispute the amount Forsythe claimed in a monthly invoice. (*Id.*) Section V of the PSA includes a provision stating that for the duration of the PSA and for one year thereafter, Forsythe and its staff would "not directly or indirectly solicit or accept any

2

engagement with [QStride]'s customers other than through [QStride], in which [QStride] has directly provided an introduction to [Forsythe], and to the extent that [QStride] has access to and knowledge of such engagement." (*Id.* at ¶ 15.) Section VI.(a) of the PSA provides for automatic annual renewal starting on November 21, 2014, and that any work on a specific SOW which continued beyond the life of the PSA would continue to be governed by the pertinent terms of the PSA. (*Id.* at ¶ 16.) Section VI.(b) of the PSA empowers QStride to terminate the PSA prior to the renewal date by providing Forsythe with ten days advance written notice of intent to terminate. (*Id.* at ¶ 17.) The PSA also includes clauses regarding waiver, attorney's fees, and the availability of remedies after the termination of the contract which are not at issue at this time. (*Id.* at ¶¶ 18-20.)

During the course of the PSA, Forsythe issued a number of SOWs relating to services to be performed by Forsythe for the benefit of several of QStride's end customers, including Crystal & Company, Inc. ("Crystal"), NICE Systems, Ltd. ("NICE"), and TLE, Inc. ("TLE"). (*Id.* at ¶ 23.) In early November 2015, there were several outstanding invoices from Forsythe to QStride regarding work perfomed by Forsythe under SOWs for end customers Crystal, NICE, and TLE. (*Id.* at ¶ 24.) On November 9, 2015, QStride informed Forsythe that pursuant to Section VI.(a) of the

3

PSA, QStride was terminating the PSA effective November 20, 2015. (*Id.* at ¶ 26.)  That same letter, however, indicated that notwithstanding its intent to terminate the PSA, QStride was interested in entering a new agreement with Forsythe, a draft of which was attached.  (*Id.* at ¶ 27.)  Later, on December 5, 2015, QStride and Forsythe adopted an additional SOW relating to Forsythe's support of existing tasks and projects undertaken for the benefit of QStride's end customers Crystal and The Learning Experience, Inc.  (*Id.* at ¶ 28.)  This December 5 SOW went on to note a few aspects in which provisions of the PSA would be modified for purposes of the December 5 SOW.  (*Id.*)

Forsythe contends that at present, there are seven outstanding unpaid invoices for work performed under the PSA and various SOWs.  (*Id.* at ¶ 29.)  Specifically, Forsythe claims that it is owed $48,720.04 for 7 specific SOWs covering work for the end clients Crystal, TLE, and NICE.  (*Id.* at ¶ 30.)  Additionally, Forsythe alleges that QStride has failed to pay interest owed for invoices which were satisfied more than 30 days after issuance, as required by Section III of the PSA.  (*Id.*)  Forsythe also claims it is owed 25% of approximately $165,000 in estimated net software licensing revenue generated by QStride during the life of the PSA.  (*Id.* at ¶¶ 32-40.)

Forsythe alleges that, at the time the PSA was terminated, they were providing business services for end

4

clients Crystal and TLE.  (*Id.* at ¶¶ 43, 44.)  Forsythe further
alleges that these end clients communicated a desire for
Forsythe to continue working with them past the termination of
the PSA, that QStride then instructed Forsythe and the end
clients to cease communication with each other or face legal
action, and that Forsythe has subsequently refrained from direct
solicitation of Crystal and TLE while maintaining they are not
required to do so.  (*Id.* at ¶¶ 47-53.)

    On January 29, 2016, Forsythe filed this lawsuit,
alleging breach of contract, unjust enrichment, and tortious
interference with a business expectancy and seeking damages,
specific performance of QStride's alleged duty to conduct an
accounting of software licensing sales revenue, and declaratory
judgment that QStride has breached the PSA and Forsythe may
engage in free business negotiations with TLE and Crystal.  On
April 11, 2016, QStride filed its Answer and Counterclaims
denying liability on Forsythe's claims and alleging breach of
contract, "Tortious Interference with Existing Contract", and
"Tortious Interference with Prospective Business
Relationships/Economic Advantages." (Counterclaims [Dkt. 7], ¶¶
17-30).  As relevant to this motion, QStride alleges that
between November 20, 2015 and January 29, 2016, "Forsythe
continued to directly and indirectly solicit business in
violation of the Agreement from QStride customers." (*Id.* at ¶

5

13.)  Further, QStride alleges that Forsythe acted wrongfully by initiating "the instant unfounded lawsuit against QStride knowingly interfering with QStride's customer relationships." (*Id.* at ¶ 14.)  QStride also alleges that Forsythe "knowingly disseminated false and disparaging statements about QStride to QStride customers harming the reputation of QStride including, but not limited to, the lawsuit itself as well as various false statements found in the Complaint." (*Id.* at ¶ 15.)  QStride does not identify any specific statements as false.  Finally, QStride levels the vague accusation that Forsythe has "continued to directly and indirectly solicit business from QStride customers" since the initiation of the contract.  (*Id.* at ¶ 16.)

On May 13, 2016, Plaintiff filed this Motion to Dismiss Counts II and III of Defendant's Counterclaims.  [Dkt. 12.]  On May 31, Defendant filed their Memorandum in Opposition. [Dkt. 14.]  On June 4, Plaintiff filed their Response Memorandum [Dkt. 16], and oral arguments were heard on June 9.  The motion is now ripe for decision.

## II. Legal Standard

Defendants move to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim, or the

applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999) (citation omitted) (internal quotation marks omitted).  "While the court must accept well-pleaded allegations as true when ruling on a Rule 12(b)(6) motion, the court need not accept as true legal conclusions disguised as factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679-81 (2009).  Therefore, a pleading that offers only a "formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  Nor will a complaint that tenders mere "naked assertion[s]" devoid of "further factual enhancement." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557. Where pleadings contain "no more than legal conclusions, [they] are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

### III. Analysis

A.        Choice of Law on Defendant's Counterclaims

        As a preliminary matter, the Court must determine whether Virginia or Michigan law governs Defendant's Counterclaims.  The SBA contains a choice of law provision providing that "the agreement shall be construed and interpreted according to, and the rights of the parties shall be governed by, the laws of the State of Michigan, without regard to any conflicts of laws provisions thereto."  (Compl., Ex. A, p. 5.)

7

QStride argues that its Counterclaims for tortious interference with contract and tortious interference with a business expectancy sound in tort rather than contract, thus the contract's choice of law provision should not apply. However, whether the Court applies the contractual choice of law provision or Virginia's choice of law doctrine for actions sounding in tort, the result is the same. Michigan law governs Defendant's Counterclaims.

This Court applies the choice of law rules of Virginia, the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect, except in unusual circumstances." *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999)(citing *Tate v. Hain*, 25 S.E.2d 321, 324 (Va. 1943)). This preference for contractual choice of law provisions means that "[w]here a choice of law clause in the contract is sufficiently broad to encompass contract-related tort claims," the intent of the parties is honored and the contractual choice of law clause is enforced. *Id.* at 628. In *Hitachi,* the Fourth Circuit held that a choice of law provision providing for application of Virginia law in the interpretation of "[t]his Agreement and the rights and obligations of the parties hereunder . . . including all matters of construction, validity and performance" was

8

sufficiently broad to encompass contract-related tort claims. *Id.* at 624. The SBA's choice of law provision is similarly broadly worded, stating that the "[a]greement shall be construed and interpreted according to, and the rights of the parties shall be governed by, the laws of the State of Michigan, without regard to any conflicts of laws provisions thereto." (Compl., Ex. A, 5.) The Court finds that this language, including both interpretation of the contract and the rights of the parties, is sufficiently broad to encompass contract-related tort claims.

Next the Court must determine whether tortious interference with contract and tortious interference with a business expectancy are contract-related tort claims. Under both Virginia and Michigan law, the "contract" at issue in a claim for tortious interference is not the contract, if any, between the plaintiff and the defendant, but a seperate contract between the plaintiff and a third party. *See Stradtman v. Republic Servs.*, No. 1:14cv1289 (JCC/JFA), 2015 WL 3650736, at *6 (E.D. Va. June 11, 2015); *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. Ltd.*, 475 F.3d 783, 800 (6th Cir. 2007). Tortious interference with business expectancy does not require the existence of any contract, but only a business relationship or expectancy. *See Dunn, McCormack & MacPherson v. Connolly*, 708 S.E.2d 867, 870 (Va. 2011); *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.,* 706 N.W.2d 843, 849

9

(Mich. Ct. App. 2005).  Clearly then, claims for tortious interference with contract and tortious interference with business expectancy are not categorically related to a contract between the plaintiff and the defendant, as claims for fraudulent inducement are.

In this case, however, QStride's Counterclaims are predicated largely on Forsythe allegedly "directly and indirectly solicit[ing] business from QStride customers in violation of the [SBA]."  (Counterclaims, ¶ 12.)  Because this action is only wrongful if it is in fact prohibited by the SBA, QStride's claims for tortious interference with contract and tortious interference with business expectancy are contract-related tort claims in this specific instance.  Accordingly, the Court will honor the parties' intent as expressed in the SBA's choice of law provision and apply Michigan law.  However, even if the Court did not apply the SBA's choice of law provision, it would reach the same result under Virginia's choice of law doctrine for actions sounding in torts and apply Michigan law.

Virginia's choice of law doctrine applies the rule of "lex loci delecti", whereby the law of the place of the wrong controls.  *Gen. Assur. Of America, Inc. v. Overby-Sewell Co.*, 533 Fed. App'x 200, 206.  Under this doctrine, the "'place of the wrong' is the place where 'the last event necessary to make an actor liable for an alleged tort takes place.'"  *Id.* (quoting

*Quillen v. Int'l Playtex, Inc.,* 789 F.2d 1041, 1044 (4th Cir. 1986)).  QStride argues that on their Counterclaims for tortious interference with contract, Virginia's choice of law doctrine requires application of the law of the place where the defendant allegedly took their improper actions.  However, under the laws of both Virginia and Michigan, actions for tortious interference with contract include the breach or termination of a contract as the last event necessary to make the actor liable.  *Id.*  Counrts in Virginia therefore apply the law of the place where the breach or termination of the contract took place, not the law of the place where the defendant took their wrongful actions.  *Id.*

QStride cites *Donn Milton, Dr. v. ITT Research Institute,* as support for their position, but *Donn Milton* addressed the proposed application of the law of a place where only the economic effects of an action were felt, *not* the law of a place where a necessary element of the cause of action took place.  138 F.3d 519, 522 (4th Cir. 1998)(Maryland law governs because actions constituting claim took place there, not in Virginia, where economic effects were felt by plaintiff).  Breach of a contract by a third party is a necessary element of an action for tortious interference of contract.  Although hard to discern from Defendant's barebones Counterclaims, it seems that any third party breach or termination of contract in this case would have taken place in Michigan, where Defendant is

11

headquartered.  Accordingly, even under Virginia's choice of law
doctrine for actions sounding in tort, Michigan law controls
Defendant's Counterclaims.

B.        12(b)(6) Analysis of Defendant's Counterclaims

          1.        Count II: Tortious Interference with
                    Contract

     In Michigan, claims for tortious interference with
contract and tortious interference with a business relationship
are distinct causes of action.  The elements of tortious
interference with a contract are "(1) a contract, (2) a breach,
and (3) an unjustified instigation of the breach by the
defendant." *Mahrle v. Danke*, 549 N.W. 2d 56, 60 (Mich. Ct.
App.1996)(citing *Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451 (Mich.
Ct. App. 1989).

     Defendant's Counterclaims fail to allege the breach of
any contract, and therefore must be dismissed.  While Defendant
conclusorily alleges that Plaintiff has interfered with several
of its clients, causing Defendant harm, Defendant has not
alleged that any of its specific clients breached their
contracts as a result of Plaintiff's interference.  In fact,
Defendant has not alleged that any of its other contracts have
been breached at all.  Without a specific allegation regarding
the breach of a contract, Count II of Defendant's Counterclaims
is insufficiently vague and must be dismissed.

2.    Count III:  Tortious Interference with

Business Expectancy

The elements of tortious interference with a business relationship in Michigan are "(1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.,* 706 N.W.2d 843, 849 (Mich. Ct. App. 2005).  In order to satisfy the third prong, one must allege "the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *CMI Int'l. Inc. v. Intermet Int'l. Corp.*, 649 N.W. 2d 808, 812 (Mich. Ct. App. 2002)(quoting *Feldman v. Green*, 360 N.W.2d 881, 886 (Mich. Ct. App. 1984).  "A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any circumstances." *Prysak v. R.L. Polk Co.,* <u>483 N.W.2d 629, 635 (Mich. Ct. App. 1992)</u>.  "If the defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific,

13

affirmative acts that corroborate the unlawful purpose of the interference." *CMI Int'l.,* 649 N.W.2d at 808.  In other words, the liability must be predicated on the defendant having done something "illegal, unethical, or fraudulent." *Dalley v. Dykema Gosset, PLLC*, 788 N.W.2d 679, 696 (Mich. Ct. App. 2010).

Here, Defendant alleges no specific acts which would tend to show "illegal, unethical, or fraudulent" behavior by Plaintiff. *Id.*  The only specific act alleged in the complaint is the filing of the present lawsuit, which Defendant contends is "unfounded". (Counterclaims, ¶ 14.)  The merit of Plaintiff's lawsuit is a legal conclusion not entitled to deference at the 12(b)(6) stage.  Additionally, the filing of a lawsuit for breach of contract is not *per se* or inherently wrongful. *Prysak*, 483 N.W. 2d at 635.  Accordingly, in its Counterclaims, Defendant needs to identify some "specific, affirmative acts that corroborate the unlawful purpose" of filing this lawsuit. *CMI Int'l.,* 649 N.W.2d at 808.  Defendant has not done so, and its Counterclaims therefore fail to allege facts sufficient to create a facially plausible claim. *Twombly,* 550 U.S. at 570.

## IV. Conclusion

For the foregoing reasons, the Court grants Plaintiff's Motion to Dismiss for Failure to State a Claim and

14

dismisses Counts II and III of Defendant's Counterclaims without

prejudice.

       An appropriate Order shall issue.


                                  /s/

_____

June 14, 2016                    James C. Cacheris
Alexandria, Virginia        UNITED STATES DISTRICT COURT JUDGE